**In re Louis JENES and Catherine Jenes, a/k/a Catherine Macheras and Catherine Patricia Brown, Debtors.**

**PAYSAVER CREDIT UNION, Plaintiff,**

v.

**Louis JENES and Catherine Jenes, a/k/a Catherine Macheras and Catherine Patricia Brown, and Jeanette A. Tavormina, as Trustee, for Louis Jenes and Catherine Jenes, a/k/a Catherine Macheras and Catherine Patricia Brown, Defendants.**

**Bankruptcy No. 81–00760–BKC–JAG–A.
Adv. No. 81–0674–BKC–JAG–A.**

United States Bankruptcy Court,
S. D. Florida.

March 2, 1982.

Barbara L. Phillips, Phillips & Phillips, P. A., Miami, Fla., for Trustee.

Jeanette E. Tavormina, Trustee.

Nelan Sweet, Miami Beach, Fla., for debtors.

Abraham A. Galbut, Galbut, Galbut & Menin, Miami Beach, Fla., for plaintiff.

FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This matter was tried on the complaint to recover property of Paysaver Credit Union against the debtor and the trustee. Paysaver seeks to recover a 1980 Cadillac which the debtor, Louis Jenes, owns and on which Paysaver claims to have a lien. Both the credit union and the debtor were "had" by a third party who received the benefit of the transactions leading up to this litigation, and whose whereabouts is presently unknown, and this court must decide which of the two will suffer the loss.

In some instances, there was conflicting testimony, particularly with regard to the actions of the now-missing third party. The court finds the facts as follows:

In and prior to 1980, Louis Jenes, who has some difficulty in understanding and speaking English, operated a service station. One Ronald W. Goodrich lived next door to the service station and frequently "hung out" there. Goodrich owned a Jaguar and an Austin Healy, "looked like a rich man" and brought his cars to the station for servicing and for gasoline. At some point Louis Jenes lent Goodrich approximately $8,000, expecting to be repaid within a few days. That loan was never repaid and other bills for gas station services gradually accumulated until Goodrich owed Jenes approximately $15,000. He made almost no payments to Jenes but Jenes continued to maintain a friendly relationship with him, partially in the hope of recovering this money.

Some time prior to April, 1980, Goodrich came to Jenes with a proposal. A friend of Goodrich, Felipe Ortega, owned a 1980 Cadillac which Goodrich said was about to be repossessed. He suggested that Jenes purchase the Cadillac by giving Ortega an older car of lesser value and taking the Cadillac subject to the lien of the Commercial Bank & Trust Company of Miami. Jenes agreed, and attempted to refinance the car through his own bank, but his credit was such that he could not get a new loan from his bank. Jenes testified that he spoke to the loan manager at the Commercial Bank who informed Jenes that as long as the bank received the regular payments (under Ortega's loan) and Jenes provided insurance on the car, it would be satisfactory to the bank. It was stipulated that the person Jenes spoke to is no longer an employee of the bank, and no opposing testimony was offered. However, because this was not a refinancing through the Commercial Bank, the certificate of title was not transferred to Jenes, and remained in the possession of the Commercial Bank.

In approximately November, 1980, Goodrich told Jenes that Ortega was going to Colombia and might never return and therefore the car matters should be settled. Goodrich offered to pay the balance of the Ortega debt to Commercial Bank as a reduction of Goodrich's debt to Jenes. The three men went to the Commercial Bank to make arrangements, at which time Goodrich called the Paysaver Credit Union. Goodrich had a small checking account, a qualifying savings account of approximately $5, and a line of credit at Paysaver. Jenes testified that he was told that the title certificate had to be sent first to the Paysaver Credit Union but he was not aware of and did not agree to a lien attaching in favor of Paysaver. He knew that Goodrich called Paysaver from the bank, but could not understand and/or could not hear the conversation.

Ms. Petry of the Paysaver Credit Union in Melrose Park, Illinois, then testified as to her telephone conversation and transactions with Goodrich. Goodrich had been a member of the credit union for approximately four years and had an unsecured line of credit with an outstanding balance at that time of approximately $5,000. He was making regular, if small, monthly payments and had "always been a good customer". He called to say that he wanted to borrow $5,500 to purchase a repossessed car from the Commercial Bank. The credit union agreed, with the understanding that it would receive the Cadillac as security for the entire indebtedness of Mr. Goodrich. Goodrich told Paysaver that he had already given a $2,000 check to the bank as a deposit to hold the car and requested that $2,000 be deposited immediately to his Paysaver checking account to cover that check. A check for $3,591.18 (Plaintiff's Exhibit No. 3) was then sent by Paysaver directly to the Commercial Bank to satisfy the bank's lien. The check was sent with a restrictive endorsement which required that Paysaver be made a lien holder before Commercial Bank released the certificate of title. Therefore, the Commercial Bank sent the title certificate directly to Paysaver. The cover letter for that transmittal was admitted as Plaintiff's Exhibit No. 2. A copy of that certificate of title is in evidence as Plaintiff's Exhibit No. 1. Paysaver put the notice of its $11,000 lien onto the title certificate and returned it to Goodrich with the expectation that he would have a new title certifi-

cate issued in his name. A new certificate was eventually returned to Paysaver, as lien holder, but it showed Louis Jenes as title owner, rather than Ronald Goodrich (Plaintiff's Exhibit No. 8). Paysaver presently claims a lien in the amount of $10,-484.91 principal, and $2,012.77 interest. The principal amount was comprised of the $2,000 transfer to Goodrich's checking account, the check to Commercial Bank for the balance of the Ortega loan, and the then-outstanding balance of the Goodrich's line of credit.

Goodrich was to make payments to Paysaver under his new consolidated loan commencing on November 30, 1980. He never made any regular payments but in January, 1981, Paysaver received a check for $3,500 which was signed by Louis Jenes (Plaintiff's Exhibit No. 7). Jenes testified that he normally had his wife or a mechanic at his service station write his checks because he does not read or write English well. On this occasion, he gave a blank signed check to Goodrich for the payment of a parts order which Goodrich was going to pick up for Jenes. Instead of paying for the piston rings with this check, Goodrich paid cash for the lesser amount of the piston rings and made out the check to the Paysaver Credit Union. Goodrich returned with the parts and after that Jenes never saw him again. Meanwhile, the check was returned for insufficient funds so Paysaver never received any actual payment on the Goodrich loan. They have tried unsuccessfully to locate Goodrich and do not know his present whereabouts.

Jenes testified that he never saw the Ortega certificate of title at all. The reverse of that certificate (Plaintiff's Exhibit No. 1) shows an application for issuance of a new certificate of title subject to the Paysaver lien. The application is purportedly signed by Louis Jenes, but the court, upon inspection of samples and hearing the testimony of both Mr. and Mrs. Jenes, is satisfied that his signature was forged. On the date shown on this application, December 10, 1980, Goodrich went to the Opa Locka Auto Tag Agency to pick up auto tags for Louis Jenes. He took Jenes' insur-

ance card, drivers license and social security book for this purpose. The application correctly shows Jenes' birth date and drivers license number, but the address shown was that of Goodrich. It appears that Goodrich used the opportunity and the identification to apply for a new title certificate in Jenes' name, without having Jenes see that Paysaver was claiming a lien of $11,000.

Plaintiff cites the court to the Florida statutes regarding motor vehicle title certificates and the recordation of liens on title certificates, Florida Statutes, § 319.22–.33, as authority for its assertion of a lien. This entirely misses the point. Before a security interest can be enforced, it must be validly created. The motor vehicle statutes provide for the perfection of security interests in motor vehicles and will prevent the enforcement, against third parties, of otherwise valid security agreements. These statutes do not deal with, or lead to creation of security interests initially.

> The motor vehicle statutes as we construe them do not create liens on motor vehicles but merely establish a method, place and procedure for recordation.

*Coplan Pipe & Supply Co., Inc. v. McCann,* 132 So.2d 632, 634 (Fla.App.1961). Cf. *Kosto v. Mullen,* 4 B.R. 748 (Bkrtcy.M.D.Fla. 1980).

The taking of collateral as security for a loan is governed by the Uniform Commercial Code. An essential requirement for the attachment of a security interest is that the debtor have rights in the collateral, § 679.-203(1)(c), Fla.Stats. No security agreement was introduced into evidence, but the court assumes one existed between Paysaver and Goodrich, based on the testimony given. However, the facts are clear that Goodrich, Paysaver's debtor, at no time had any rights in the Cadillac, which Paysaver claims as its collateral. Paysaver therefore cannot have a security interest in it, and the motor vehicle statutes, as well as many of the other facts in the case are irrelevant.

The court has considered imposing an equitable lien in favor of Paysaver for the $3,591.18 it paid to satisfy the Commercial

Bank lien. However, Jenes did not receive a windfall through that payment because Goodrich already owed Jenes a greater obligation, and as far as Jenes is concerned, the $3,591.18 was a partial satisfaction of that debt. Paysaver was bilked by Goodrich, not by Jenes, so no equitable lien should be imposed. Plaintiff cannot prevail on its complaint.

Pursuant to B.R. 921(a), a separate Final Judgment incorporating these Findings and Conclusions is being entered this date.